

# IN THE
# TENTH COURT OF APPEALS

### No. 10-19-00004-CV

**TEXAS CENTRAL BUSINESS LINES CORPORATION,**
                                                            **Appellant**
 **v.**

**U.S. POLYCO, INC.,**

                                                            **Appellee**

### From the 40th District Court
### Ellis County, Texas
### Trial Court No. 92159

## MEMORANDUM OPINION ON REMAND

Texas Central Business Lines Corporation (TCB) appeals from an adverse

judgment rendered in favor of U.S. Polyco, Inc. (USP) after a jury trial in this breach of

contract suit. On original submission to this Court, we disagreed with the trial court

regarding its interpretation of a pivotal contract provision, determined the provision to

be ambiguous, reversed the trial court's judgment, and remanded for a new trial. *See Tex.*

*Cent. Bus. Lines Corp. v. U.S. Polyco, Inc.*, 10-19-00004-CV, 2022 Tex. App. LEXIS 5231 (Tex.

App.—Waco July 27, 2022) (mem. op.), *rev'd*, 681 S.W.3d 383 (Tex. 2023) (per curiam). The Texas Supreme Court determined that the trial court correctly construed the contract provision at issue and this Court erred in holding that it was ambiguous. The Supreme Court remanded the case to this Court for further proceedings. *U.S. Polyco, Inc.*, 681 S.W.3d at 391. We affirm.

## Background

In 2014, TCB and USP agreed to construct a USP plant to expand its asphalt operations at TCB's terminal and switching railroad facility. They entered into two agreements, a "Railroad Allowance Agreement" (RAA), regarding required infrastructure improvements, and a "Transload Agreement" (TA), regarding USP's future operations at the facility. The following year, because of disagreements regarding each party's responsibility for paying for infrastructure improvements, USP sued for breach of contract, and TCB counterclaimed for breach of contract.

In its suit, USP alleged that TCB failed to repay USP the amount that USP paid above $1.2 million, the contractually agreed upon maximum USP was required to pay for infrastructure improvements, and TCB failed to complete and pay for construction of infrastructure improvements. In its counterclaim, TCB alleged that USP breached the RAA by failing to pay all contractor costs up to $1.2 million for the construction of the TCB infrastructure improvements and breached the TA by failing to reimburse TCB for the costs associated with the construction of utilities for USP.

The trial court granted USP's motion for partial summary judgment in part, concluding as a matter of law that:

> Under § 1.1(3) of the Railroad Allowance Agreement entered into as of July 14, 2014 between USP and TCB, the phrase "as are agreed upon by TCB and Customer in writing" modifies only the phrase "other items in or adjacent to the Designated Areas" and does not modify the phrase "various concrete and ground surface improvements, including without limitation slabs for truck scales and racks, tank and appurtenant structures to house personnel, oil heating, and steam generation equipment, curbs and planters for parking areas.

Application of the trial court's interpretation of Section 1.1(3) results in the determination that the parties agreed that concrete slabs and foundations were TCB infrastructure improvements.

A jury heard the case, determined that TCB committed a material breach of the RAA, and awarded USP $8,699,989 in damages. The jury also found that neither party breached the TA. The trial court denied post-trial motions filed by TCB and entered a final judgment in favor of USP, awarding $8,699,989 in damages, $1,138,149.25 in pre-judgment interest, $347,000 in attorney's fees, and attorney's fees for appeals to this Court and the Texas Supreme Court. TCB appealed.

On original submission to this Court, we determined that the trial court erred in granting USP's partial summary judgment, abused its discretion by including an instruction on its interpretation of Section 1.1(3) of the RAA in the charge, and the error was harmful. We reversed the trial court's judgment and remanded for further proceedings. *See Tex. Cent. Bus. Lines Corp.*, 2022 Tex. App. LEXIS 5231, at *19.

The Texas Supreme Court disagreed and determined that the trial court correctly construed Section 1.1(3).  That court reversed our judgment and remanded the case to us for further proceedings.  *See U.S. Polyco, Inc.*, 681 S.W.3d at 391.

**Remaining Issues**

The Supreme Court's holding confirms the trial court's construction of Section 1.1(3) as providing that concrete costs were included in costs for TCB infrastructure improvements.   The remaining issues before us revolve around sufficiency of the evidence to show 1) which party breached the RAA, centering on whether USP obtained approval for the concrete work, and 2) whether USP breached the TA, focusing on which party was responsible for paying the costs of providing utility connections at the site.

**Standard of Review**

**A.  Sufficiency of the Evidence**

**1.  Legal Sufficiency**

Appellate review is impacted by who had the burden of proof at trial.  A party challenging the legal sufficiency of the evidence to support an issue upon which it did not have the burden of proof at trial must demonstrate on appeal that there is no evidence to support the adverse finding.  *Exxon Corp. v. Emerald Oil & Gas Co.*, 348 S.W.3d 194, 215 (Tex. 2011).  A party attacking the legal sufficiency of the evidence in support of a finding upon which it had the burden of proof must demonstrate on appeal that the evidence establishes, as a matter of law, all vital facts in support of its proposed disposition.  *Dow*

*Chem. Co. v. Francis*, 46 S.W.3d 237, 241 (Tex. 2001) (per curiam). In reviewing such a matter-of-law challenge, we employ a two-part test. We first examine the record for evidence that supports the finding, while ignoring all evidence to the contrary. *Id.* If there is no evidence to support the finding, we then examine the entire record to determine if the contrary proposition is established as a matter of law. *Id.* A proposition is established as a matter of law when a reasonable fact finder could draw only one conclusion from the evidence presented. *See City of Keller v. Wilson*, 168 S.W.3d 802, 814-16 (Tex. 2005).

In a legal-sufficiency review, we consider the evidence in the light most favorable to the verdict, indulging every reasonable inference in favor of the verdict. *Autozone, Inc. v. Reyes*, 272 S.W.3d 588, 592 (Tex. 2008) (per curiam); *Associated Indem. Corp. v. CAT Contracting, Inc.*, 964 S.W.2d 276, 286 (Tex. 1998). To determine whether legally sufficient evidence supports a challenged finding of fact, we credit evidence that supports the finding if reasonable jurors could, and disregard contrary evidence unless reasonable jurors could not. *See Kroger Tex. Ltd. P'ship v. Suberu*, 216 S.W.3d 788, 793 (Tex. 2006); *see also City of Keller*, 168 S.W.3d at 822. The factfinder is the sole judge of the credibility of the witnesses and the weight to be assigned to their testimony. *See City of Keller*, 168 S.W.3d at 819. The factfinder is free to believe one witness and disbelieve another and resolve all conflicts in the evidence. *Id.* at 820. Where conflicting inferences can be drawn from the evidence, it is within the province of the factfinder to choose which inference to

draw, so long as more than one inference can reasonably be drawn. *Id.* at 821. Reviewing courts must assume that the factfinder decided all credibility questions, resolved all conflicts in the evidence, and made all inferences in a manner consistent with the findings, and chose what testimony to disregard in a way that was in favor of the findings, if a reasonable person could do so. *Id.* at 819-21.

The final test for legal sufficiency must always be "whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review." *Id.* at 827. Anything more than a scintilla of evidence is legally sufficient to support the finding. *See Cont'l Coffee Prods. Co. v. Cazarez*, 937 S.W.2d 444, 450 (Tex. 1996). More than a scintilla of evidence exists when the evidence supporting the finding, as a whole, rises to a level that would enable reasonable and fair-minded people to differ in their conclusions. *Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex. 1997); *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 751 (Tex. 2003). Less than a scintilla of evidence exists when the evidence is so weak as to do no more than create a mere surmise or suspicion of a fact. *Chapman*, 118 S.W.3d at 751.

### 2. Factual Sufficiency

In reviewing a factual-sufficiency challenge, an appellate court must consider and weigh all of the evidence. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986) (per curiam). When a party attacks the factual sufficiency of an adverse finding on an issue on which the opposing party had the burden of proof, we should set aside the verdict only if it is

so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Id.* We may not pass upon the witnesses' credibility or substitute our judgment for that of the factfinder. *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003).

## B. Judgment Notwithstanding the Verdict

A trial court may disregard a jury's verdict and render a judgment notwithstanding the verdict (JNOV) if there is no evidence to support the jury's findings or if a directed verdict would have been proper. *See* Tex. R. Civ. P. 301; *Brown v. Bank of Galveston*, 963 S.W.2d 511, 513 (Tex. 1998). We review the trial court's ruling on a motion for JNOV under a legal-sufficiency standard. *See Tanner v. Nationwide Mut. Fire Ins. Co.*, 289 S.W.3d 828, 830 (Tex. 2009). We credit evidence favoring the jury verdict if reasonable jurors could, and disregard contrary evidence unless reasonable jurors could not. *Id.* We must uphold the jury's finding if more than a scintilla of competent evidence supports it. *Id.*

### Applicable Law

#### Breach of Contract

The elements of a breach-of-contract claim are: (1) the existence of a valid contract between plaintiff and defendant; (2) the plaintiff's performance or tender of performance; (3) the defendant's breach of the contract; and (4) the plaintiff's damage as a result of the breach. *Runge v. Raytheon E-Systems, Inc.*, 57 S.W.3d 562, 565 (Tex. App.—Waco 2001, no pet.).

## Railroad Allowance Agreement

In its first issue on remand, TCB asserts there was legally and factually insufficient evidence to support the jury's findings as to jury questions one and two in which the jury found that TCB breached the RAA and that breach was material. In its second issue, TCB asserts the trial court erred in entering judgment in favor of USP on USP's breach of contract claim and in denying TCB's motion for judgment notwithstanding the verdict. TCB contends that its actions cannot be a breach of the RAA because USP had not met the Maximum Customer Payment. Similarly, in its third issue, TCB attacks the jury's negative response to question five, in which it was asked if USP failed to comply with the RAA. TCB argues that the evidence proves that USP breached the RAA as a matter of law when it refused to pay all contractor costs up to the Maximum Customer Payment. Accordingly, it contends the trial court erred in entering judgment on question five in which the jury found that USP did not breach the RAA and denying TCB's motion for judgment notwithstanding the verdict regarding the same issue.

TCB relies heavily on Section 2.1 of the RAA, which provides, in relevant part, that:

> Any work for construction of the TCB Infrastructure Improvements to be performed under a contract between Customer and a contractor, without involvement of Engineer, will require approval of TCB (which approval will not be unreasonably withheld or delayed) and Customer will pay for the work as approved by TCB. The maximum amount to be advanced or paid cumulatively by Customer under this paragraph 2.1 is One Million Two Hundred Thousand Dollars ($1,200,000.00) ("Maximum Customer Payment"). Customer will also pay all costs related to work authorized by

a change order requested by Customer. All costs of construction of the TCB Infrastructure Improvements which cumulatively exceed the Maximum Customer Payment amount will be paid in a timely manner by TCB.

TCB contends that this provision means that any contract between USP and a contractor that did not involve TCB's engineer required TCB's approval to be considered a TCB infrastructure improvement. TCB further argues that much of the money that USP paid out was for concrete work done by three USP contractors, that work was not approved by TCB, and TCB was not involved in this work. Accordingly, TCB's argument continues, Section 2.1 of the RAA prevented USP from allocating the costs associated with the concrete work toward the $1.2 million Maximum Customer Payment. Thus, TCB asserts, because the cost of this work cannot be counted toward the Maximum Customer Payment, USP never reached the Maximum Customer Payment and, thus, breached the RAA. Furthermore, it contends, TCB's request that USP pay for items that were TCB infrastructure improvements could not constitute a breach of the RAA because USP had not met the Maximum Customer Payment.

**Discussion**

Under Section 1.2 of the RAA, TCB employed Lunsford & Associates Consulting Engineers of Arlington, Texas "to prepare engineering plans and specifications suitable for construction of the TCB Infrastructure Improvements and as the project engineer for their construction." In other words, Lunsford & Associates L.C. was the "Engineer" for the TCB infrastructure improvements. According to John R. Schieber, an engineer and

Vice-President and Partner of RMS Engineering, Rick Lunsford of Lunsford Associates L.C. was initially responsible for the foundations and USP's storage tanks. However, RMS Engineering later got involved in the construction of concrete foundations.

Daniel DeJarnette, USP's former Vice-President of Operations, oversaw the construction of USP's plant. Both DeJarnette and Schieber testified that Lunsford informed them that he was shifting responsibility for the design and construction of the concrete infrastructure, including the slabs and foundations, to USP and RMS Engineering. Specifically, DeJarnette testified that:

> Originally there was some soil analysis done on the facility where we were going to be putting the—installing the tanks and the various equipment for the facility. Once we had that soil analysis, our engineer, through RMS, there was some uncertainty as to whether TCB, through Lunsford, would be signing the contract for concrete foundations or whether it would be us since it was part of the infrastructure.
>
> We had a call with Lunsford and then, later on, with Mr. Lorman and the context of the conversation was is [sic] since the concrete was specific to our tank and our needs we should work on, you know, handling the design and the concrete side of it.

Lunsford did not recall such a conversation.

The record also demonstrates that Lunsford coordinated with other engineers on the project, including Schieber, regarding the construction of the concrete infrastructure. Specifically, regarding coordination with Schieber, Lunsford noted:

> Well, we would coordinate activities that were related to the design. We— we needed to coordinate, you know, the rail locations. Mr. Schieber was designing the piers and structures related to the MEP work that went in

between our rail tracks and he was also designing a bridge structure that crossed one of the rail tracks that supported pipes and a walkway.

And so there's—and then the design for our railroad ditch between the two—between our rail and the Polyco facility, we coordinate the location of the berm that was proposed there by J.R. initially. We get some coordination back and forth related to that so the berm slope didn't encroach into our ditch and just the preliminary grading for the entire site involved grading and containment area in addition to the grading in the parking lot and the rail area.

The coordination just makes sure that all that fit together and worked together. So he was involved with initial calculations and thought he was going to contain the basin and kind of a preliminary grading plan or two. We were working with the rail and the other infrastructure.

So it required coordination, some back and forth sharing of information, so we'd do the best job we could to get the work together.

Schieber testified that he provided Lunsford with the plans for the concrete slabs, though Lunsford denied approving the plans, or being asked to approve the plans. Lunsford acknowledged that he was "involved" in the construction that took place in the containment basin that included construction of the foundations related to the storage tanks, piping, and other equipment. Regarding the foundation for USP's plant, Lunsford stated:

We were not involved with the foundation for the building other than for the grading work related to the elevation of what that foundation was going to be. We did have some coordination to find—to find out what elevation their building to finish for, their elevation was going to be, and we did review their plans that they had to see how many inches below the foundation the subgrade was supposed to be.

And so we did have some coordination or calls just to verify so we could tell our grading contractor where to leave the pad whenever he

finishes his grading so the building contractor could come in, put his flex space or material fill and then his sand and reinforcing the rest of that.

Despite being the project engineer for TCB infrastructure improvements, Lunsford denied ever meeting with USP representatives to review construction of the concrete foundations they were building and denied involvement regarding utilities construction.

In any event, the evidence shows that Lunsford ordered and paid for geotechnical testing and recommendations related to construction of the slabs and foundations. This testing was performed by Fugro Consultants, Inc., and the report and recommendations were sent directly to Lunsford and TCB. Schieber stated that the Fugro report and recommendations were ordered by Lunsford and paid for by TCB. Fugro's report provided testing results and recommendations for the construction of foundation pads, footing and tank foundations, mat foundations, deep foundations, floor slabs, and retaining walls. Furthermore, Addendum #2 from Fugro specifically related to the placement of concrete foundations. This addendum was directed to Lunsford and TCB. Moreover, Lunsford testified that Jay Mills Contracting Company did the grading work on the project and that Lunsford's involvement in the grading work was as follows:

> We prepared the plans for the grading work. We submitted the plans to the contractor along with specifications and general notes that apply to this project. We solicited a bid from the contractor and we did the—reviewed his bid. Compared it to what our original estimates were, and made recommendations to the owner to award the contract.

Schieber emphasized that none of the concrete design or concrete work could be done without the geotechnical testing or the involvement of Lunsford's company.

The record also contains a July 31, 2015 email from Lunsford to the TCB accounts payable department, as well as TCB's vice president, Jon Lorman, which included a payment application from Jay Mills Contracting Company and indicated that Lunsford had "visited the site and observed the Contractor's progress during the month." In this email, Lunsford recommended that TCB pay Jay Mills Contracting Company $57,829.85. In addition to the foregoing, Lunsford and his contractor were also involved in completing the subgrade under USP's facility to prepare the site for concrete foundation construction.

USP bore the burden at trial to prove that TCB breached the RAA as presented to the jury in questions one and two. Therefore, on appeal TCB is required to show there was no evidence to support the jury's findings on these two questions. *Exxon Corp.*, 348 S.W.3d at 215. Viewing the foregoing evidence in the light most favorable to the jury's verdict, we conclude that there is legally sufficient evidence demonstrating that TCB's engineer, Lunsford, was substantially involved in the process of concrete construction for the TCB Infrastructure Improvements. *Reyes*, 272 S.W.3d at 592. Therefore, under Section 2.1 of the RAA, USP was not required to obtain TCB's approval for the work, and TCB was responsible for payment for "costs of construction of the TCB Infrastructure Improvements which cumulatively exceed the Maximum Customer Payment amount . . . ."

As shown through testimony from Marvin Small, USP's Chief Financial Officer, as well as through various invoices and spreadsheets, USP paid $1,839,498.60 toward the improvements, primarily on dirt, grading, utilities, and concrete. Thus, the record contains evidence that USP paid more than $1.2 million toward TCB infrastructure improvements, satisfying Section 2.1. Accordingly, because TCB did not reimburse USP for amounts paid above $1.2 million, there is legally sufficient evidence to show TCB materially breached the RAA as found by the jury in questions one and two. *See Runge*, 57 S.W.3d at 565.

It follows that TCB's argument that USP breached the RAA also fails. TCB had the burden to prove at trial that USP breached the RAA, addressed in jury question five. Thus, TCB had to demonstrate on appeal that the evidence establishes as a matter of law all vital facts in support of its assertion that USP did not comply with Section 2.1. *See Dow Chem. Co.*, 46 S.W.3d at 241. The evidence as previously recited that USP paid more than $1.2 million toward TCB infrastructure improvements constitutes more than a scintilla. *See Havner*, 953 S.W.2d at 711. Thus, TCB did not meet its burden to establish as a matter of law that USP breached the RAA by refusing to pay all contractor costs up to the Maximum Customer Payment. The jury did not err in not finding, in question five, that USP breached the RAA. *See Runge*, 57 S.W.3d at 565.

TCB also contends the evidence is factually insufficient to support the jury findings in questions one and two. It is TCB's burden on appeal to show the verdict is so

contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *See Cain*, 709 S.W.2d at 176. We recognize that the record contains contrary evidence, primarily from Lunsford, regarding Lunsford's purported lack of involvement in the TCB infrastructure improvements. To the extent that the evidence conflicts regarding Lunsford's involvement in the TCB infrastructure improvements under section 2.1 of the RAA, we emphasize that the jury, as the trier of fact, bore the burden of resolving the conflicts in the evidence and judging the credibility of the witnesses. *See Jackson*, 757 S.W.3d at 761.

Viewing the evidence in the proper context, we conclude that the jury's findings on questions one and two are supported by legally and factually sufficient evidence. *See Reyes*, 272 S.W.3d at 592; *City of Keller*, 168 S.W.3d at 822; *Associated Indem. Corp.*, 964 S.W.2d at 286; *see also Cain*, 709 S.W.2d at 176; *Runge*, 57 S.W.3d at 565. Additionally, the jury's finding on question five is supported by legally sufficient evidence. *See Havner*, 953 S.W.2d at 711. Furthermore, based on the foregoing, we conclude that the jury's findings on questions one, two, and five are supported by more than a scintilla of competent evidence. *See Tanner*, 289 S.W.3d at 830. Therefore, we cannot say that the trial court erred by refusing to grant TCB's request for a judgment notwithstanding the verdict. *See* Tex. R. Civ. P. 301; *see also Brown*, 963 S.W.2d at 513. We overrule TCB's first, second, and third issues.

**Transload Agreement**

In its fourth issue, TCB asserts USP breached the TA as a matter of law by failing to reimburse TCB for costs of construction of utilities. Therefore, the argument continues, the trial court erred in entering judgment on the jury's finding in question seven and in denying TCB's motion for judgment notwithstanding the verdict on the same basis.

**Discussion**

TCB asserts that the TA required TCB to obtain permits and provide connections for utilities and required USP to reimburse TCB for those costs. TCB contends that the TA was effective as of the date it was signed even though the TA contains a provision stating that the term of the TA will commence after TCB's engineer certifies in writing that the infrastructure improvements required by the RAA are completed. Moreover, TCB contends that utilities are not part of "infrastructure" as contemplated by the RAA and are therefore not to be included in the $1.2 million Maximum Customer Payment. Instead, it argues, utility costs are covered by the TA as specified in paragraph six and there is no conflict between the two contracts regarding those costs.

Because TCB had the burden at trial to prove USP breached the TA, it must demonstrate all vital facts in support of the issue were established as a matter of law. *See Dow Chem. Co.*, 46 S.W.3d at 241. In this matter of law challenge, we first examine the evidence that supports the finding and ignore evidence to the contrary. *See id.*

The question of whether USP breached the TA requires consideration of certain terms of the RAA. Relevant portions of the RAA provide:

**1.3.1 Estimate of Cost and Schedule of Work.** . . . A preliminary estimate of the cost of the TCB Infrastructure Improvements is attached hereto and is incorporated into this Agreement by this reference. Upon acceptance by Customer and TCB of the final estimate provided by Engineer, the final estimate will supercede the preliminary estimate and be attached hereto and incorporated into this Agreement as an Exhibit Y.

. . . .

**2.1 Progress Payments and Certificate of Payment.** . . . All costs of construction of the TCB Infrastructure Improvements which cumulatively exceed the Maximum Customer Payment amount will be paid in a timely manner by TCB.

**2.2 Actual Costs of Construction.** As used in this Agreement, "Actual Costs of Construction" will mean all engineering, surveying, testing, plan and permit fees, bidding costs, construction contractor charges, utility costs, deposits and connection fees, worksite security and insurance charges, and all other costs and expenses authorized by Engineer . . . and incurred after the date of this Agreement in connection with or incidental to the construction of TCB Infrastructure Improvements, but specifically will not include any fees or expenses of Engineer and its contractors incurred to the date of this Agreement.

**2.3 TCB Allowance to Customer.** During the first ten (10) years following the Completion Date under paragraph 1.5 of this Agreement (the "Allowance Period"), TCB will provide an allowance to Customer to reimburse Customer for its payment of Actual Costs of Construction under Paragraph 2.1 of this Agreement.

The document referenced in Section 1.3.1 is entitled "TCB Infrastructure Improvements Preliminary Opinion of Project Costs," and is comprised of two pages, dated July 3, 2014. It includes entries for water and sanitary sewer costs on the second

page. TCB's vice president, Jon Lorman, testified that the estimate was prepared by engineers, and the infrastructure improvement costs are on the first page. He opined that the utility costs included on page two are project costs, and he was sloppy in attaching the second page of the estimate. He admitted that when he attached these two pages, they became part of the contract. No final estimate, referenced in Section 1.3.1, was ever provided by the engineer. The record also contains an email, dated July 3, 2014, from Lorman to Marvin Small, USP's Chief Financial Officer. Attached to the email is the same preliminary cost estimate. In the email, Lorman explained that "the maximum amount that TCB could permit as an allowance to be reimbursed to U.S. Polyco," as stated in RAA Section 2.1, was derived from the costs set out in the preliminary cost estimate. Lorman admitted that he authorized work on utilities and paid for that work.

The relevant portion of the TA is its paragraph 6. A June 9, 2014 email from Lorman to Small contained an explanation of Lorman's most recent proposed changes to the TA. As is pertinent here, he stated: "Paragraph 6 has been modified to provide you with the option to include the utility installation costs you pay for be includable as recoverable costs under the Railroad Allowance Agreement." Small explained that paragraph 6 was reworded in case USP expanded in the future and needed additional utilities, USP could add the new costs to the original $1.2 million and earn that back.

Paragraph six of the TA, as executed, provides in part:

**Utilities**.  Except as otherwise agreed by the parties in writing, TCB will obtain all permits and provide all connections necessary for electricity, water, sewer, telephone or other utilities at the Designated Area.  Customer will reimburse TCB for its engineering, legal, and construction costs for this work, upon receipt from TCB of an invoice from TCB with substantiation of the costs to be reimbursed; at the time Customer pays the TCB invoice, Customer may elect by written notice to TCB to amend the Railroad Allowance Agreement to (a) increase the "Maximum Customer Payment" by the amount so paid by Customer, and (b) include the amount so paid by Customer in the "Actual Construction Costs" (as such terms are defined in paragraphs 2.1 and 2.2 respectively of the Railroad Allowance Agreement).  Customer will pay for all utility services furnished to the Designated Area for use by Customer, either as separately metered by the serving utility or as determined by TCB according to a usage allocation applied to all users of the service as metered.

Small testified that Section 2.2 of the RAA means that costs to put utilities in is included in costs of construction.  He explained that the only infrastructure was TCB infrastructure.  USP planned to put its equipment on TCB's infrastructure.  Small testified that USP's understanding of the meaning of the RAA was that utilities were included in TCB infrastructure, and the term of the TA would begin "[a]fter infrastructure was complete and signed off."  Small said he did not agree to pay for all infrastructure, just $1.2 million worth.  Small stated that paragraph six of the TA did not require any action by USP before the effective date of the TA and the provision to recover utility costs was not yet in effect.

DeJarnette testified that he understood that anything that was permanent or in the ground was part of TCB infrastructure.  He explained that, if USP ceased doing business

there, utilities would stay. He thought paragraph six means TCB would provide connection points that USP would hook its utilities to.

Although Section 1.1 of the RAA specifies only rail track, a driveway, and concrete and ground surface improvements as "TCB Infrastructure Improvements," under Section 2.2, utility costs and other costs incurred in connection with or incidental to the construction of TCB infrastructure improvements are included in "Actual Costs of Construction." RAA Section 2.3 states that TCB would provide a customer allowance for reimbursement for its payment of Actual Costs of Construction under Section 2.1. Additionally, paragraph 6 of the TA allowed USP to recover utility costs pursuant to the RAA as "Actual Construction Costs." The amount USP was required to pay, $1.2 million, was based on the preliminary cost estimate which included utilities. Based on the language in the RAA and TA, the jury could reasonably infer that utility costs were included in the $1.2 million Maximum Customer Payment. *Reyes*, 272 S.W.3d at 592.

Furthermore, the jury was able to contrast the provisions of the RAA with those of paragraph six of the TA. That paragraph would require USP to reimburse TCB for utility costs and amend the RAA to include utility costs in "Actual Construction Costs." However, the plain reading of the RAA indicates utilities were already included. The jury was entitled to resolve any perceived conflict by application of Section 3.7 of the RAA which provides that if there is any conflict between the terms of the RAA and any other agreement between the parties, the terms of the RAA will prevail.

Finally, the jury could also consider the effective term of the TA. USP was to pay $1.2 million up front for TCB infrastructure improvements in exchange for a cash allowance for each eligible rail car interchanged by TCB and transloaded by USP for a period of ten years "following the Completion Date." According to Section 1.5 of the RAA, the completion date is the date the engineer certifies TCB infrastructure improvements are complete.

The TA includes a paragraph identifying the time period in which it is in effect:

**II. Term and Termination.** Customer and TCB concurrently are entering into a separate Railroad Allowance Agreement ("Railroad Allowance Agreement") which provides for the construction of TCB Infrastructure Improvements (as defined therein) to be used in connection with the performance of this Agreement. The term of this Agreement will commence on the first day of the calendar month immediately following the date that the Engineer (as defined therein) certifies in writing is the Completion Date (as defined therein) of those Improvements pursuant to paragraph 1.5 of the Railroad Allowance Agreement ("Effective Date") and will continue in effect for ten (10) years thereafter or until sooner terminated by written notice from one party to the other.

Lorman testified that the term of the TA relates to the period of time USP has the right to transload. This is consistent with Small's testimony. Instead of the TA becoming effective on the date it is signed, as argued by TCB, paragraph II provides that the TA would become effective when the infrastructure was in place, enabling USP to begin its operations. TCB admitted that the engineer never certified that the infrastructure improvements were complete. Therefore, applying the TA's paragraph II, the jury could have reasonably determined that the term of the TA never began. *See Associated Indem.*

*Corp.*, 964 S.W.2d at 286. Therefore, even if USP was to pay utility costs pursuant to paragraph 6 of the TA, it was never required to pay invoices for utility costs presented by TCB because the term of the TA never commenced. Accordingly, there is more than a scintilla of evidence to support the jury's finding in question seven that USP did not breach the TA. *See Havner*, 953 S.W.2d at 711. Likewise, the trial court did not err in denying TCB's motion for JNOV on the question of breach of the TA. *See Brown*, 963 S.W.2d at 513. TCB did not meet its burden to prove as a matter of law that USP breached the TA. *See Dow Chem. Co.*, 46 S.W.3d at 241. We overrule TCB's fourth issue.

## Conclusion

The evidence is legally and factually sufficient to support the jury findings on questions one and two that TCB materially breached the RAA. The evidence also supports the jury's findings on questions five and seven that USP did not breach the RAA or the TA. Further, the trial court did not err in denying TCB's motion for JNOV. Due to our disposition of issues one through four, we need not reach TCB's complaint about attorneys' fees in its fifth issue. *See* TEX. R. APP. P. 47.1.

We affirm the trial court's judgment.


STEVE SMITH
Justice

Before Chief Justice Gray,
      Justice Smith, and
      Justice Davis[1]
(Chief Justice Gray dissents)
Affirmed
Opinion delivered and filed December 30, 2024
[CV06]



---

[1] The Honorable Rex Davis, Senior Justice (Retired) of the Tenth Court of Appeals, sitting by assignment of the Chief Justice of the Texas Supreme Court. *See* TEX. GOV'T CODE §§ 74.003, 75.002, 75.003.